John Hamasaki (SBN: 260031)
john@hamasakilaw.com
**HAMASAKI LAW**
534 Pacific Avenue
San Francisco, CA 94133
Tel: (415) 525-4245
Fax: (415) 276-2871

Attorney for Defendant
PETER EIDELMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR-19-00431-WHA |
| Plaintiff, | **DEFENDANT PETER EIDELMAN'S SENTENCING MEMORANDUM** |
| v. | |
| PETER EIDELMAN, | Date:    July 14, 2020 |
| Defendant. | Time:    1:30 p.m. |
| | Court:    Hon. William H. Alsup |

1

**TABLE OF CONTENTS**

2

I. INTRODUCTION………………………………………………………………………4

3

II. MR. EIDELMAN'S HISTORY AND CHARACTERISTICS…………………………...5

4

    A. Childhood and Upbringing………………………………………………..………5

5

    B. Peter Becomes the Focus of the Family……………………………...…………….6

6

    C. Mr. Eidelman's Parents' Health Declines……………………………………….…8

7

    D. Background on the Offense ………………………………………………….……..9

    E. The Aftermath……………………………………………………………….…...10

8

III. THE COURT MAY CONSIDER SEVERAL FACTORS IN SUPPORT OF A DOWNWARD

9

VARIANCE FROM THE ADVISORY GUIDELINES………………………………………11

10

IV. FACTORS IN SUPPORT OF A RECOMMENDED SENTENCE…………………………13

11

    A. Mr. Eidelman Accepts Full Responsibility for His Actions…………………….....14

12

    B. Mr. Eidelman Has Dedicated Himself to Rehabilitation………………………….15

    C. Mr. Eidelman's Background and Family History Impacted the Offense………...……17

13

    D. Mr. Eidelman Has Lived His Life Taking Care of Others…………………………19

14

    E. Mr. Eidelman Has Incurred Significant Punishment…………………………….....21

15

    F. Mr. Eidelman Is the Primary Caretaker for His Schizophrenic Adult Brother...………23

16

    G. Mr. Eidelman Is Deeply Remorseful for His Actions…………………...…………25

V. CONCLUSION……………………………………………………………………….25

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*United States v. Carty,*

4

520 F. 3d 984, 991 (9th Cir. 2008)……………………………………………. ……………12

*United States v. Booker,*

5

534 U.S. 220, 245 (2005)…..................................................................................12

6

*United States v. Diaz-Argueta,*

7

445 F.3d 1167, 1172 (9th Cir. 2006)…………………………………………....…12

8

*United States v. Snellenberger,*

9

548 F.3d 699 (9th Cir. 2008)……………………………………………....…13

10

*United States v. Ovid,*

11

2010 W.L. 3940724, (E.D.N.Y. Oct. 1, 2010)………………………………..…...13

12

**Statutes**

13

18 U.S.C. § 3553 (a)(2)(A)-(D)……………………………………….…………………11

14

18 U.S.C. § 3553(a)(1)………………………………………………………....11

15

18 U.S.C. § 3553(a)(3)………………………………………………………....11

16

18 U.S.C. § 3553(a)(4)…………………………………………………….......12

18 U.S.C. § 3661…………………………………………………………………12

17

18

**Other Authorities**

19

John R. Emshwiller, *White Collar Sentences Get a Fresh Look,* Wall Street Journal (June 19,

20

2013)…………………………………………………………………………..12

21

Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for*

22

*Economic Offenses,* 25 Crim. Just. 34, 38 (2011)………………………………………..13

23

24

25

26

27

28

A. **INTRODUCTION**

Defendant Peter Eidelman respectfully submits this memorandum to assist the Court in fashioning an appropriate sentence in this case. Mr. Eidelman pled guilty to the single charged count of Mail Fraud in violation of 18 U.S.C. § 1341. The government has agreed to accept the guideline calculations in the Plea Agreement and recommend a sentence of no more than 18 months' imprisonment in the Bureau of Prisons. Probation also accepted the guideline calculations in the plea agreement, but recommended a sentence of 24 months' imprisonment. While neither recommendation is patently unreasonable, the unique facts and circumstances of Mr. Eidelman's background and character suggest that a term of probation, continued counseling, and significant community service would be a sufficient sentence.

Peter Eidelman appears before this Court a 54-year-old man who, prior to the conduct in this case, lived an upright and exemplary life defined by his relationship with his family and his dedication to his work and career. The question of how he fell so far, so fast, rests on the unique circumstances of his background and personal history. And while a deep understanding of his background explains his fall, it also provides a clear path for his rehabilitation and redemption.

On March 22, 2019, agents investigating this case approached Mr. Eidelman at the Department of Motor Vehicles in Capitola, California. Immediately after being advised of the nature of the meeting, Mr. Eidelman took full and complete responsibility for the criminal conduct in this case. In addition, he described to the agents how he had committed the crime and agreed to fully cooperate with the investigation. Mr. Eidelman also immediately offered to pay back the funds and later that day arrived at the FBI San Jose Field office with a check for the full amount of loss. (Ex. A: Peter Eidelman Letter.)

Mr. Eidelman returned home to his family and shared the terrible decisions he had made and explained that he would be facing criminal prosecution and potential imprisonment. While he could describe each of the actions that he had taken in committing the crime, he struggled to answer the most important question for his family, "Why?" Why would a man

DEFENDANT PETER EIDELMAN'S SENTENCING MEMORANDUM
CR-19-00431-WHA

who had lived his life defined by a set of core values do something so absolutely contrary to those same values? Why would a man who had dedicated his life to his family and career do something that would place both in jeopardy? On March 22, 2019, and in the days and weeks that followed, he struggled to answer those questions for himself and his family.

As his life seemingly fell apart before his eyes, Mr. Eidelman did something that he wasn't accustomed to – he asked for help. On April 25, 2019, he began a long and difficult process of therapy that has helped him come to terms with his childhood and upbringing, and the familial pressures that had propelled him to success, but also set in motion the actions that led to his appearance before this Court. (PSR ¶ 51-52, Also Ex. A: Peter Eidelman Letter and Ex. B: Sharon Parvizi Letter.) While he understands the tremendous harm that he has caused, Mr. Eidelman also, once again, believes that he can be a good and decent contributing member of society, while supporting his family and the community in a positive way. (Ex. A: Peter Eidelman Letter.)

## II.    MR. EIDELMAN'S HISTORY AND CHARACTERISTICS

### A.    Childhood and Upbringing

Mr. Eidelman was born in Boston, Massachusetts, and resided in Norwood, a suburb of Boston, until the age of 13. His mother Anita worked as a dental hygienist, but spent most of her time pursuing a calling as an artist, and his father was a certified public accountant. (Psych Eval, Section V, Pages 2 & 4.) Mr. Eidelman's father was also physically abusive towards their mother and the young boys at times. (*Id.*, Page 7.) Mr. Eidelman had one brother, Andy, who was a star athlete and gifted actor until schizophrenia derailed his promising life in his late teens and early twenties. (*Id.*, Page 3.) His parents divorced when he was four years old and the two young boys lived with their mother and visited with their father on the occasional weekend (*Id.*, Page 2-3.)

Once Mr. Eidelman's father moved out, he stopped providing for the family, except for minimal child support. Because his mother struggled with depression and only worked intermittently, she struggled to make ends meet and keep the two boys fed and clothed. She would often disappear into her room for long stretches, leaving the boys to fend for

themselves. Andy often took the lack of supervision as an opportunity to inflict violent beatings on Peter, leaving bruises and soreness on his back. At age 13, Andy went to go live with their father and Peter was left alone with his mother. (*Id.*, Page 2-3.)

After Andy left, Peter found himself in the role of caretaker for his mother, whose depression caused her to live an isolated and lonely life. At a young age, Peter had become the man of the house, and learned to support and care for his mother and manage the day-to-day challenges. During this same time, Andy was off becoming the superstar of the family, excelling at sports, academics, and acting. Instead of competing, as brothers often do, Peter was more than happy to cheer on his big brother's accomplishments, while earning his own contentment from taking care of their mother. (*Id.*, Page 3.)

### B. Peter Becomes the Focus of the Family

During this time, Mr. Eidelman's father focused on Andy and his achievements, and did not have a particularly close relationship with Peter, until after Andy's illness began to manifest itself. However, once Andy became ill, all of the family's hopes and dreams were shifted to Peter. (*Id.*, Page 13.) Just as he had stepped up to take care of his mother, Peter adapted and worked hard to meet the new expectations that were placed on him. His father was suddenly interested in everything about his life; his school, his future, his accomplishments. The rest of the family soon followed and Peter went from the quiet kid in the background to the center of the family's attention. (*Id.*, Page 3.)

Even through all of the turmoil between his parents, there was one thing they could agree on – Peter would carry on the family's dreams and expectations of success in business. Perhaps it was a function of the era, but for his parents and even grandparents, success was measured by entrepreneurship, and professional accomplishment was not sufficient – you were not truly a success unless you owned your own business. His grandparents' family had been successful business owners and his father, in addition to his CPA office, started a handful of unsuccessful small businesses, including a toy store and an investment in an automatic bicycle invention. (*Id.*, Page 6; Also AOR Section 4.)

Mr. Eidelman dutifully focused his energies on pleasing his father and his family, and

went away to college and majoring in Business Administration. His father's role in his life continued to grow and when he finished college, Mr. Eidelman went to work for his father's accounting business. Daily, his father pushed him to find a path to business, and to build a business that he could own. Mr. Eidelman put his head down and worked hard, but at 25, the pressure became too much and he decided that he would have to move away from home to escape the parental pressure, moving to Cupertino, California. (Psych Eval Section V, Page 3-4.)

The move, though, did nothing to quell his father's pressure on Mr. Eidelman. For over 20 years until he passed away, the father and son would speak daily by phone, and nearly every call would bring up some version of the question, "When are you going to start your own business?" While Mr. Eidelman's father was supportive of his career and would bask in each promotion or success at work, the conversation would nearly always shift to the question of how Mr. Eidelman would translate that success into entrepreneurship. (Psych Eval Section V, Page 6.)

The pressure continued, even after Mr. Eidelman was married and raising four children while working 60-80 hours a week to support his family. By all accounts, even with the long hours, he was an attentive and devoted husband and father, staying up into the night and waking early to meet all of the competing demands on his time. (Ex. B: Sharon Parvizi Letter, Ex. C: Lauren Parvizi Letter, & Ex. E: Sydnie Eidelman Letter.) But over time, his parents' obsession became his own, and he began spending his free time searching for a business to own. His wife, Sharon Parvizi, describes how this went on throughout their marriage, with Mr. Eidelman seeking business idea after business idea, all of which Ms. Parvizi found to be either unrealistic or impossible to manage with his current work schedule and family. (Ex. B: Sharon Parvizi Letter.)

During this time, the pressures from work and Mr. Eidelman's family began to merge and metastasize. He had been hired at the company in March of 2015, after the entire management team, minus the CEO, had been fired after failing to deliver revenue growth and posting a few years of multi-million-dollar losses. Mr. Eidelman was hired with a mandate to

1   restructure the company, stop losses, and increase profitability. He dug right in and his work

2   commitment continued at 70-80 hours per week, including international travel and working

3   long days into the evening and weekends to achieve the company's goals. Mr. Eidelman's

4   efforts began to pay off and through the restructuring, the company realized annual recurring

5   savings of $50 million dollars over 2015 and 2016 and delivered annual profitability. (Psych

6   Eval Section V, Page 5.)

7           **C.      Mr. Eidelman's Parents' Health Declines**

8           At the same time as he was achieving remarkable career success, Mr. Eidelman's

9   parents' health began a precipitous decline, and it was getting harder to keep up. His mother

10  began having issues with memory loss and balance issues in 2016. In between the 70-80 hours

11  a week he was putting into the company, he now jumped back into the caretaker role for his

12  mother, visiting her at least one weekend a month and often two weekends a month. (Psych

13  Eval Section V, Page 4.)  He also spent time with his brother, Andy, to help prepare him for

14  their mother's eventual passing. In 2017, Mr. Eidelman's mother took a turn for the worse,

15  with progressive memory loss and ambulatory challenges, including falls, and requiring help

16  from Andy to safely navigate from her bed to the bathroom. Peter increased his commitment to

17  nearly full-time, staying with his mother and brother from December 2017 through her passing

18  in February 2018. (*Id.,* Page 4-5, Also Ex. B: Sharon Parvizi Letter, Page 2.)

19          Mr. Eidelman's father retired from his CPA practice in 2015 due to issues with his

20  health and mobility including kidney problems, three prior back surgeries, and stints in his legs

21  to increase blood flow. He used a walker to get around due to his mobility problems. His

22  health continued to decline in his retirement and the phone calls between father and son

23  increased in duration and frequency to fill the void left by retirement. Ms. Parvizi described

24  how this increased contact impacted Mr. Eidelman, turning his desire to own a business from a

25  hope to "practically pathological." (*Id.*)

26          Mr. Eidelman was now CFO of an international corporation, but spent his free time

27  searching for businesses for sale, any business, just to own a business, at one point becoming

28  fixated on a leather-goods company called "Sunset Leather Company." The name for the

1    company Mr. Eidelman created to commit the offense in this case was named "SLC Advisors",

2    an abbreviation of Sunset Leather Company.  Mr. Eidelman had no background, interest, or

3    association with leather goods prior to finding this company, but became fixated on it until Ms.

4    Parvizi put the brakes on the idea as unrealistic and impossible to manage with his current

5    workload. (*Id.*)

6         At the time, Mr. Eidelman was being pulled in different directions by his family, his

7    children, his parents, his work, the need to turn profits for his company, and the pressure to

8    own a business. As he had always done, he put his head down and got it done. He made sure

9    his family was well taken care of, pushed to find new cost savings at work, and searched for

10   businesses by night, working long days and nights without much time to himself. There was

11   also the very real possibility of a career failure and getting fired at work if he could not keep

12   finding more costs to cut to grow profits with limited increase in revenues. Over this past year

13   in therapy, Mr. Eidelman has come to terms with the fact that while he was doing all of these

14   things, the right things, he hadn't spent much time contemplating why he was doing them – at

15   least not the "pathological" drive to own a business.

16        **D.    Background on the Offense**

17        Over the length of his career, Mr. Eidelman had developed expertise in managing the

18   financial systems within the companies he worked for, producing historical reports, developing

19   budgets, preparing forecasts and evaluations of business segments. He created models to

20   provide management with monthly, quarterly, and annual reporting in order to help drive

21   business planning and decision-making. Each reporting period would require him to hire teams

22   of people who would then work days and weeks to prepare each month's reports. Over time, he

23   came to recognize that significant cost and labor savings could be generated through

24   automating much of this work. It finally came to him, this could be it, his business.

25        Although Mr. Eidelman was making a comfortable income, much of it was going out to

26   support his immediate and extended family as well as mortgage payments. (Psych Eval Section

27   V, Page 5.) He soon came up with a solution; he would simply learn coding and develop this

28   software application himself. He began teaching himself coding earnestly in 2016, trying after

- 9 -

his long days of work and family obligations to squeeze in time in order to develop the software himself. Although ambitious, it was likewise futile, as the application he envisioned was degrees more complicated than he could learn to code himself. (AOR, Page 3.) This is when things went wrong, where his life began to unravel.

Mr. Eidelman continued to dream about this software application, the thing that would finally set him on the road to realizing his long-held goal of being a true entrepreneur. At the same time, after restructuring, he was running out of costs to cut at the company. In the moment, it seemed like a solution to both problems, he would redeem himself to his father, while saving the company money with the software application. As he researched how to create this business, he also came to understand the tremendous costs associated with starting a software application of this nature. He thought about how much money this application could ultimately save the company, and with that, made the worst decision of his life: he rationalized taking money that didn't belong to him. (AOR Page 3, Also Ex. A: Peter Eidelman Letter.)

As reflected in the Plea Agreement, in early 2017, Mr. Eidelman created a company called "SLC Advisors" and entered into a service agreement with the company. Beginning in June of 2017 and ending on February 2, 2018, Mr. Eidelman sent a series of five invoices from SLC Advisors to the company, and later collected payment in totaling $340,706.25. The money was spent on developing the software application he had envisioned, including market research (approximately $175,000.), software development (approximately $100,000.), internet hosting ($40,000.), and the rest on computer hardware, software, and other related expenses. While a prototype was developed, it never reached the stage of being an actually commercially feasible product before Mr. Eidelman lost his job.

### E.    The Aftermath

On February 3, 2018, Mr. Eidelman's mother died two weeks after being diagnosed with liver cancer. The end of 2017 had been difficult and after she had a bad fall, Andy had called the paramedics. Their mother was initially in the hospital, moved to a short-term care facility, and then, when she continued to decline, was moved to a long-term facility in January of 2018. Peter went to her side and cared for her in her final days, sitting with her and feeding

her. He also spent time with Andy after her passing preparing him to live without their mother and ensuring that his mental health did not decline without the structure and support of their mother. (Psych Eval Section V, Page 4.)

Also, in 2018, Mr. Eidelman's father took a fall resulting in traumatic brain injury and spent six weeks in a rehabilitation facility. After being released, his decline continued and he was moved to an assisted care facility. Mr. Eidelman continued to visit his father at least once a month and cared for him in his last days, before he passed away on March 11, 2019. (*Id.*) Although he loved his father very much, through therapy Mr. Eidelman came to terms with the uncomfortable realization that the greatest sensation after his father's passing was one of relief. For the first time in many years, Mr. Eidelman felt free. (Ex. B: Sharon Parvizi Letter.) Eleven days later, agents approached him at the DMV and he confessed.

## III.   THE COURT MAY CONSIDER SEVERAL FACTORS IN SUPPORT OF A DOWNWARD VARIANCE FROM THE ADVISORY GUIDELINES

The Court "shall impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes [of the] . . . need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553 (a)(2)(A)-(D).

In determining the minimally sufficient sentence, courts consider these purposes, as well as "the nature and circumstances of the offense and the history and characteristics of the defendant," (§ 3553(a)(1)), and "the kinds of sentences available" (§ 3553(a)(3)). In short, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to

provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citations omitted).

The Court may also consider the guideline ranges, which are advisory under *United States v. Booker*, 543 U.S. 220, 245 (2005). 18 U.S.C. § 3553(a)(4). The Sentencing Reform Act, as revised by *Booker*, "requires a sentencing court to consider Guideline ranges, see 18 U.S.C. § 3553(a)(4)(Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." *Booker*, 543 U.S. at 245 (citations in original). The guideline range is just one of several factors that determine a sentence, and the "Guideline factor [should not] be given more or less weight than any other." *Carty*, 520 F.3d at 991 ("The district court may not presume the Guidelines range is reasonable. *In fact, the Guidelines do not distinguish the sentences of perpetrators who have offended once before from those for whom this is their only offense, which is inherently problematic.* Nor should the Guidelines factor be given more or less weight than any other. While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.") Other statutory provisions further promote the Court's discretion in formulating Mr. Eidelman's sentence. Pursuant to 18 U.S.C § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Because the guideline range is one of several factors the Court must consider, when the guidelines call for a sentence in conflict with the other factors, the other factors should trump the guideline recommendation. "Sentencing is a difficult art. It is easy to make it mechanical. It is impossible to make it scientific in the sense of a hypothesis validated or invalidated by experiment. It is, however, an act of reason as the judge looking at this particular person and the circumstances of the crime that this particular person has committed makes a judgment following the prescriptions of the statute." *United States v. Diaz-Argueta*, 447 F.3d 1167, 1172 (9th Cir. 2006) overruled on other grounds in *United States v. Snellenberger*, 548 F.3d 699 (9th

1    Cir. 2008).

2           This discretion is particularly important in cases that rely heavily on the amount of loss,

3    an area where the guidelines have been subject to much criticism. As more and more judges

4    and scholars have recognized, a sentence determined solely by the amount of loss does not

5    "fairly convey the reality of the crime or the criminal." (See John R. Emshwiller, White Collar

6    Sentences Get a Fresh Look, Wall Street Journal, June 19, 2013 (quoting Judge Jed Rakoff).[1]

7    Even the Obama Department of Justice recognized that, as then-Attorney General Holder

8    stated to the American Bar Association: "too many Americans go to too many prisons for far

9    too long, and for no truly good law enforcement reason. . . Statutes passed by legislatures that

10   mandate sentences, irrespective of the unique facts of an individual case, too often bear no

11   relation to the conduct at issue, breed disrespect for the system, and are ultimately

12   counterproductive. . . We need to ensure that incarceration is used to punish, to rehabilitate,

13   and to deter — and not simply to warehouse and forget."

14          Courts can and should consider a host of factors beyond the amount of loss to

15   determine an appropriate sentence. See, e.g., *United States v. Ovid*, 2010 W.L. 3940724, at *1

16   (E.D.N.Y. Oct. 1, 2010) ("the fraud guidelines, despite its excessive complexity, still does not

17   account for many of the myriad factors that are properly considered in fashioning just

18   sentences, and indeed no workable guideline could ever do so."); Allan Ellis, John R. Steer,

19   Mark Allenbaugh, At a "Loss" for Justice: Federal Sentencing for Economic Offenses, 25

20   Crim. Just. 34, 37 (2011) ("While the fraud guideline focuses primarily on aggregate monetary

21   loss and victimization, it fails to measure a host of other factors that may be important, and

22   may be a basis for mitigating punishment in a particular case.")

23          This case is one where the unique facts and circumstances justifies a sentence outside

24   of the guideline range and the sentence imposed need not be one of imprisonment in the

25   Bureau of Prisons.

26   ///

27   ───────────────

28   [1] http://online.wsj.com/article/SB10001424127887323300004578555601936723828.html.

- 13 -

1    **IV.    FACTORS IN SUPPORT OF RECOMMENDED SENTENCE**

2        **A.    Mr. Eidelman Accepts Full Responsibility for His Actions**

3        Mr. Eidelman has accepted responsibility for his actions in a manner that is sincere,

4    thoughtful, and reflective of this desire to rehabilitate and redeem himself. When he was first

5    approached by agents on March 22, 2018, Mr. Eidelman immediately admitted to the conduct

6    and described the manner in which the crime was committed. He cooperated fully with the

7    agents and provided them with a check for the full loss amount the same day. (Ex. A: Peter

8    Eidelman Letter.)

9        Mr. Eidelman returned home after meeting with the agents and immediately told his

10   wife. Later that day, he sat down with his children, Sydnie and Charlotte, and admitted to them

11   what he had done. (Ex. F: Charlotte Eidelman Letter.) In the days, weeks, and months that

12   followed, he disclosed his conduct to his extended family, his close friend Bob Kasman, and to

13   his therapist. (Ex. U: Robert Kasman Letter.) Throughout each of these conversations, one

14   theme emerged – Mr. Eidelman was dedicated to facing his failures head-on and addressing

15   the underlying stressors that contributed to the offense.

16       A review of the character letters submitted by Mr. Eidelman's family and friend reveals

17   a consistent and indelible picture of a man who has, since childhood, lived his life to serve and

18   support others, primarily his large and, at times, complicated family. In addition, to those who

19   know him, he has been law-abiding citizen, almost to a flaw, and has always lived his life to do

20   the right thing, not the easy thing.  His children are perhaps the closest witnesses of the way

21   Mr. Eidelman has lived his life. His step-son Parker referred to Mr. Eidelman as a "beacon of

22   ethics, reputation, proper behavior, and 'doing the right thing'." (Ex. D: Parker Cox Letter.)

23   His daughter explains that her upbringing was "largely paralleled with the Law," and that her

24   father "believes in rules, and not bending them." (Ex. F: Charlotte Eidelman Letter.) This is

25   perhaps why he struggled so greatly to come to terms with what he had done and the dramatic

26   harm he had caused to the family that he dedicated his life to.

27       Through the insight shared from his family, one can see the struggles that Mr.

28   Eidelman has undergone to reconcile the decent man he was before with the actions he took in

this case. Sandra Lane, Mr. Eidelman's sister-in-law, shared her experiences with Mr. Eidelman:

> "Now, Peter is filled with expressions of deep and profound remorse and regret which we know are sincere. His shame is palpable, and I worry for him that he might define himself by this one large mistake, rather than the totality of decades long service to responsibilities and burden that were his only by virtue of his astonishing generosity." (Ex. L: Sandra Lane Letter.)

Mr. Eidelman has spared no criticism in his assessment of himself, identifying selfishness and arrogance as qualities that led to the commission of the offense. He recognizes the dramatic fall he has taken, in the eyes of his family, the law, and society, and offers not just an apology, but a deep yearning to redeem himself. Mr. Eidelman writes:

> "I want to be able to look at myself and see the honest, respectable, grateful, reasoned person I once was and truly now believe that I am again going forward. I need to know myself as a person of integrity and strong character again and my family needs to know that the man and life they knew before I committed this crime, was real and I am still that man." (AOR Page 1.)

Mr. Eidelman is clear and direct in admitting that the crime he committed was not out of necessity and did not need to occur. He recognizes that he not only failed his family, whom he has always worked to care for to the best of his ability, but he also betrayed those that he worked for that had placed deep levels of trust in him, including the company, its shareholders, his colleagues and coworkers. He understands that he was once a man who was highly regarded and well-respected, perceptions by others that he may never regain, even with years of dedicated and upright living. He recognizes the abject failing of this conduct as a CFO stating: "To violate that trust violates every duty a CFO holds and is valued by. They put their trust in me and I violated it in the worst way possible for a CFO." (AOR at 2.)

**B.      Mr. Eidelman Has Dedicated Himself to Rehabilitation**

Mr. Eidelman has made tremendous strides in his rehabilitation efforts since being contacted by agents in March of 2019. He immediately addressed the crime and his conduct head-on with his family and took full responsibility for the damage he had caused. When he found himself struggling to explain his actions, he began a course of therapy that helped him

work through his complicated relationship with his parents, and come to understand how his drive to please his family had, in the end, irreparably damaged their lives. His therapist shared her experiences working with Mr. Eidelman:

> "In working with Peter over the past ten months I have come to know him as a moral, caring and conscientious man. He is a hard worker, and a very considerate, loyal caretaker of his family. I see him as working hard to make amends for his action, never making excuses for his behavior." (Ex. Kaye Bishop Letter.)

The qualities identified by his therapist are the same as those that appear throughout the character letters: hard-working, conscientious, family-focused, and driven to make right the wrongs he has done. While he soon embraced the growth and self-reflection that he was experiencing through counseling, it was a long road to reaching the understanding that he has today. Mr. Eidelman has stated:

> "The one good to come out of this whole terrible process was that it forced me to seek help through therapy. Therapy is not something that I would have sought otherwise, it is just how I was raised. I grew up with traditional and perhaps restrictive views on how I should approach dealing with challenges…I am grateful that I have been able to seek therapy and plan to continue working on my personal growth.
>
> I have realized through therapy that I do not have to carry all of these burdens internally and by myself. This has been liberating for me, if maybe too late." (Ex. A: Peter Eidelman Letter.)

Mr. Eidelman has gone from a man who struggled to explain his conduct to one that can now not only understand his stressors and motivations, but also address them and learn from them. While it is a terrible way to learn, sometimes we do not have the tools to make change until a dramatic incident forces us to reflect and seek help. Mr. Eidelman seized this opportunity to repair the harm, and the long-term lessons he has learned from therapy will allow him to be a better father, husband, provider, and member of the community. In addition, Mr. Eidelman underwent a complete psychological evaluation with Dr. Amanda Gregory in late 2019 and early 2020. After the lessons he had learned through therapy, he wanted to address head-on any other issues that might still be unresolved. Although a difficult process, he learned more about his inner workings, his motivators, his stressors, and identified areas that

1    he would like to continue to work through with therapy.

2          In addition, Mr. Eidelman has dedicated himself to addressing the harm that his actions

3    have caused to his family, including his wife, children, brother, and extended family. The loss

4    of his employment also created an opportunity to spend more time with his family and restore

5    their faith in him as a father, husband, and provider. Mr. Eidelman has focused on rebuilding

6    these relationships on a foundation of trust, transparency, and ethics. (AOR Page 1.)

7          Mr. Eidelman has also dedicated himself to redemption within the community,

8    volunteering with the American Red Cross blood drives in Santa Cruz, including during the

9    COVID-19 pandemic, when the organization needed additional help. He has also spent time

10   volunteering at food drives in Santa Cruz County to help those in need. In total, he has logged

11   over 100 hours of community service since April 2019.

12         Mr. Eidelman has since been working part-time as a business consultant, which has

13   enabled him to pay for and provide health care coverage for himself, his wife, and children.

14   He has also been helping his family to prepare their home for sale as they restructure their lives

15   due to the offense.

16         Through seeking treatment for himself, rebuilding his family's trust, and serving the

17   community, Mr. Eidelman appears before this Court a far different man than only a year ago.

18   The work that he has done for himself, his family, and society demonstrates that he is a man

19   who has taken this opportunity to truly seek rehabilitation and redemption.

20         **C.      Mr. Eidelman's Background and Family History Impacted the Offense**

21         While Mr. Eidelman has been very direct and unwavering in stating that there are no

22   excuses for the crime he committed, there is room for understanding. (AOR Pages 2 & 4; Also

23   Ex. A: Peter Eidelman Letter.) Mr. Eidelman comes from a family where success was

24   measured by one's success as an entrepreneur. (AOR Page 3.) While anyone would look from

25   the outside and see a successful man with a prestigious career, internally, Mr. Eidelman always

26   felt like he was a disappointment to his parents, and especially his father. (Psych Eval Section

27   V, Page 6.)

28         After his father and mother fell into decline, Mr. Eidelman felt like time was running

out to prove to his parents that he was the child that they had always wanted: the entrepreneur. The daily calls with his father only reinforced the idea that time was running short after his mother fell ill. (*Id.*) Mr. Eidelman's wife was all-too-familiar with the destructive impact of the parental pressures that he was always receiving, describing it as the "root of his undoing." In her letter to the court, Ms. Parvizi recounts:

> "Peter's response to parental pressure was always to work extremely hard to please them. It's just sad that this has not only led to his achievements and successes, but is also the root of his undoing. I so wish he'd started therapy before this crime, instead of after. I feel certain it would have been avoided." (Ex. B: Sharon Parvizi Letter.)

Ms. Parvizi discusses in her letter about how the need to own a business became almost "pathological" as his father's health began to deteriorate. Looking in from the outside, it makes no sense. How could someone who had lived his life according to the law and principles and ethics, do something so horribly wrong? But at the same time, it is the only thing that makes sense, it is the only thing that explains it. Mr. Eidelman is not a man of luxury, spending money on clothes, cars, or jewelry. Rather, he buys his clothes at Kmart, and uses his earnings to support an extended and needy family. (*Id.*)

It is fair to say that perhaps many of the people who end up in criminal courts were driven by things they had no control over; their childhood, their parents, abuse, neglect. Mr. Eidelman is clearly among them. This is why it is necessary to view the complete man before this Court, a man who has worked hard since childhood to be good and decent, and to love and support his parents. These are all generally good qualities, though in this case, the confluence of events in 2016 and 2017, turned those positive qualities on their head. That drive that many of us share, to please our parents, to make them proud, turned from a positive source of motivation into a toxic hold on his psyche leading him to break every rule that he had lived by in order to fulfill his parents' wishes. It does not excuse or justify anything, but understanding the root of the fall helps one to understand that Mr. Eidelman will rise again from this moment in his life.

### D.      Mr. Eidelman Has Lived His Life Taking Care of Others

While intense, almost obsessive, parental pressure seems to have clearly motivated the offense, the question remains, "Why did a successful CFO need money to start a business?" That question goes to the heart of the other consistent character trait of Mr. Eidelman – the need to be the caretaker to his family. Again, it is the lessons of his childhood that have guided his life.

Mr. Eidelman was the youngest child of an abusive father and bullying brother. (Psych Eval Section V, Pages 6-7.) When they both left the picture, he was left alone with his mother, a solitary woman who struggled with depression. Mr. Eidelman learned at a very young age that he would have to step in and fill the void created by his mother's struggles and his father's absence. He learned that his greatest value to his family was to care for his mother, the one person that remained in his life after his father and brother left. He tended to the house, the maintenance, and also his mother's emotional needs. As a young boy, he was the closest person to his mother throughout his childhood. (*Id.*, Pages 2-3; Also Ex. B: Sharon Parvizi Letter.)

When things went bad with Peter's brother Andy, who had previously been his hero, it also fell on him to jump in and help his parents with his older brother as he descended into schizophrenia. (Psych Eval Section V, Page 3.) He was the go-between with his estranged parents as they sought help from medical professionals when Andy's behavior became stranger and more bizarre while away at college in his early twenties. It took nearly five years of shuttling between doctors before Andy was properly diagnosed and a stretch in a mental health facility before he stabilized through medication and treatment. (*Id.*)

Mr. Eidelman's relationship with Ms. Parvizi also illustrates his drive to fill the caretaker role. While still a young man in his twenties, Mr. Eidelman entered into her family and took over jointly raising her two children, Lauren and Parker. He supported her desire to be a full-time mother and carried all of the financial burden himself, making for some difficult years early in the marriage. After Sydnie and Charlotte came along, the burdens increased, as did Mr. Eidelman's responsibilities. As observed by nearly everyone, Mr. Eidelman did not

- 19 -

just work 60-80-hour workweeks, he also took over every night when he got home, feeding the kids, helping clean, and putting the kids to bed. He spent years sleeping on the floor of the children's room to help soothe the kids so they would sleep at night. (Ex. B: Sharon Parvizi Letter.)

Ms. Parvizi and others recount in their letters to the court that not only was Mr. Eidelman supporting his own family and children throughout his adult life, he was supporting Ms. Parvizi's extended family, many of whom struggled with financial hardship and disability. The list is too long to recount here, but is amply addressed in the character letters. (Ex. J: John Lane Letter and Ex. P: Joan Murrin Letter.) Joan Murrin, Mr. Eidelman's mother-in-law describes many of the ways that Mr. Eidelman helped support her and her children over the course of his relationship with Ms. Parvizi, including her own living expenses, her medications, and numerous bills. (Ex. P: Joan Murrin Letter.)

Ms. Parvizi's brother John, is disabled and has struggled with mental health and caring for himself. Mr. Eidelman has provided the funds necessary to sustain John and keep him from falling into homelessness. (Ex. J: John Lane Letter.) Mr. Eidelman's income also enabled Ms. Parvizi to dedicate numerous hours just to tending to John and his mental health and to help keep him stable. (Ex. B: Sharon Parvizi Letter.) Her brother Rich has also struggled with mental health and poverty, both of which Mr. Eidelman and Ms. Parvizi have taken it upon themselves to manage and support, both financially and through social support. (*Id.*) As her Uncle Pete lay dying in 2015, they paid the bills to keep him as healthy and comfortable in his final days. Mr. Eidelman, after working long hours, would often cook for him. (*Id.*) As Joan Murrin, Mr. Eidelman's mother-in-law observed:

> "I was so touched when Peter spent his weekend hours cooking turkeys and hams for my brother Pete to enjoy during the months when he was dying, here in my home in 2015. My brother loved Thanksgiving and Christmas foods. Peter also made sure that he had everything that he needed to alleviate the suffering in his final days, from food and groceries, to special pajamas that helped reduce the pain of bedsores." (Ex. P: Joan Murrin Letter.)

When Mr. Eidelman's stepson, Parker, had an autistic son, Abram, the medical

DEFENDANT PETER EIDELMAN'S SENTENCING MEMORANDUM
CR-19-00431-WHA

challenges soon overwhelmed the young family. Mr. Eidelman stepped in and covered the cost of various treatments and support to help Abram through his difficult early years. Parker's wife, Allison Gregg describes it as follows:

> "Peter, who in addition to providing for his own immediate family, is the primary financial resource for Sharon's extended family, many of whom are growing old and having health issues. On top of that he has managed to help Abram obtain the treatment and support he so desperately needs.
>
> I can't say enough how much this generosity has benefitted Abram. He is now verbal, he is slowly catching up to normal development, he graduated from a special needs class to "neuro-typical" pre-k classes. It is still a long road, but Peter, while still putting two of his daughters through college, was able to help us make Abram healthy. I am eternally grateful." (Ex. D: Parker Cox Letter.)

It was not just family that Mr. Eidelman tried to help, but also friends and neighbors who brought their problems to the family. Mr. Eidelman seemed to have a nearly compulsive desire to help those in need, without ever asking anything in return. As an example, Ms. Parvizi relates a time early in their marriage when a woman whose step granddaughter she was babysitting came to her with a problem. She told Ms. Parvizi that her step granddaughter's mother who recently had a child was about to go into foster care because the mother was in prison. Without being particularly close to the family, and motivated only by helping keep the child from foster care, Mr. Eidelman agreed to take the child in until the mother was released from prison. These were not just kind words, they actually went and visited the mother in prison in Southern California, and agreed to take the child, before there was a change of heart by the mother. (Ex. B: Sharon Parvizi Letter.)

Finally, there is Mr. Eidelman's relationship with his brother Andy. Perhaps because of the onset of schizophrenia, Andy was violently abusive to Mr. Eidelman growing up. Then he descended into the depths of the disease before finding treatment and stabilizing. Throughout all of those difficult years, Mr. Eidelman never once turned his back on his brother, even after their difficult childhood. As their mother became ill, the brothers became closer and began speaking more and more often as Andy needed someone to talk to who could help him maintain his stability during this time. (Psych Eval Section V, Pages 4-5; Also Ex. B: Sharon

1   Parvizi Letter and Ex. H: James Andrew Eidelman Letter.)

2   Mr. Eidelman is at his core a caretaker and a family man, giving his time, money, and

3   resources to those in need, those struggling, and those who would suffer without his help.

4   While he was making a comfortable income for his immediate family, a look at the broader

5   community he has served helps demonstrate why the family never had the money that his

6   status and income would suggest. In fact, his income and assets as listed in the Pre-Sentence

7   Report reveals that the vast majority of his assets are from the inheritance left behind by his

8   mother in 2018. (PSR ¶ 63.)

9   **E.     Mr. Eidelman Has Incurred Significant Punishment**

10   Since this criminal case began, Mr. Eidelman's life has been changed irrevocably,

11   some for the better, some for the worse. At the outset, Mr. Eidelman has learned and grown

12   tremendously from this process, through therapy and through many long talks with his family.

13   He has a better sense of himself and who he is and the mistakes he has made and the lessons he

14   has learned. (Ex. A: Peter Eidelman Letter.) On the other hand, the fact remains that his life

15   and career will never be the same. He will not be able to practice in his profession again, as his

16   ability to retain his CPA license is gone. While there will be opportunities for employment, the

17   career he worked his whole life for is over at what should be the peak of his career. (Psych

18   Eval Section V, Page 6.)

19   Mr. Eidelman and Ms. Parvizi have put their family home up for sale to reduce

20   expenses and ensure that they are able to continue to support their children and extended

21   family. The collateral impact to Mr. Eidelman's family, who had no knowledge of this crime,

22   has been significant over the past year and will continue to be an emotional and economic

23   challenge for his immediate and extended family for many years, if not forever. At 54 years of

24   age, his ability to start a new career will be challenging. He does have a strong skill set from

25   his career, but a felony conviction will preclude most, if not all, job opportunities in his field.

26   Also, he is unlikely to be hired in any position that has either direct contact with money or

27   responsibility for management of money. In addition, a quick internet search of his name now

28   reveals this criminal case and it is not difficult to determine the charge. Finding an employer

- 22 -

who will hire someone with a background in business and finances with a recent fraud conviction seems highly unlikely.

It is difficult to escape the cruel irony of this case and its outcome. A talented and highly successful man, driven to commit fraud in order to fulfill an unhealthy need to meet his parents' expectations of owning a business despite his age and maturity, seems to be in a position where the only work he may find will be in running his own business of some sort. Nonetheless, Mr. Eidelman is confident that through hard work and dedication, he will rise from this moment and, as he has all of his life, be there for his family and loved ones. (AOR; Also Ex. A: Peter Eidelman Letter.) But that does not mean that he will ever regain his earning potential nor his ability to support a family who has always depended on him, perhaps too much at times.

### F.     Mr. Eidelman Is the Primary Caretaker for His Schizophrenic Adult Brother

Mr. Eidelman plays a critical caretaker role in the life and mental health of his adult brother, James Andrew ("Andy") Eidelman. The role is more admirable with an understanding of the background and upbringing of the brothers. Three years older, Andy Eidelman was the childhood star, excelling in sports, academics, and theatre, while Peter was content to be the little brother living in the background. Although Peter looked up to his big brother, Andy could be violent growing up, often bullying and beating Peter for no reason. (Psych Eval Section V, Page 7.) After Andy went away to college, he began to show signs of schizophrenia, before being officially diagnosed at the age of 25. It took close to five years of shuttling between doctors and a group home before Andy was stabilized through medication. After stabilizing, Andy moved in with their mother, where they lived together until her passing. He was able to find a job at Verizon scheduling time-off requests through a program for people with disabilities. As an adult, Andy apologized for the abuse he inflicted on Peter as a child and the two developed a close and endearing relationship. (*Id.*, Page 2.)

After their mother passed away on February 3, 2018, and father passed away on March 11, 2019, Peter became the sole surviving member of their immediate family and Andy's only

source of emotional and familial support. (Ex. H: James Andrew Eidelman Letter.) The brothers speak daily, often many times a day. Andy will call and they will discuss what Andy ate for dinner, something that happened at work, or other seeming trivialities that nonetheless provide Andy with much-needed stability and structure. (Ex. B: Sharon Parvizi Letter.)

Peter's wife, Sharon, describes their relationship as follows:

"With their passing, Andy's well-being now falls solely on Peter. They may talk about the weather three times in the same day. Andy will detail his drive to work. No meal goes undescribed. Andy's own (impossible) professional business aspirations are often discussed, with Peter gently trying to redirect his interests. Andy's many calls often come early as he forgets the time zones. I worry for him if Peter isn't accessible. He has no-one else to share his life with. I'll try to fill in, but it won't be the same." (Ex. B: Sharon Parvizi Letter.)

Andy's letter to the Court best summarizes their relationship:

"I speak to my brother Peter every day. He is my last family member and my close friend. We talk about our day when we drive to work and sometimes after work. We speak on the phone and sometimes use the video face time on the weekends. We talk sometimes 4 to 6 times on the weekends. I do not know what I would do without these calls as they mean a lot to me. I know that they mean a lot to my little brother as well." (Ex. H: James Andrew Eidelman Letter.)

Reading the rest of Andy's letter fills in the details and the mindset of Andy, a simple overgrown child in the body of a 57-year-old man. He describes his breakdown in college as having spent some time in a hospital and a "special home to find out about my illness." Andy describes a young Peter carrying Andy's large set of dictionaries to college and reminisces, "I really liked those books." He talks about when Peter used to come visit after moving to California as "Peter would spend lots of time with me at night and on the weekends, he would visit after my mom would go to sleep. We would also take in late night movies as well." Andy further states, "I wish that my brother could travel to Boston to visit like he used to before the charges of illegal activity." (Ex. H: James Andrew Eidelman Letter.)

In sum, Peter is truly Andy's last close familial tie and he depends on him for both emotional support and management of the complexities of modern life. Not only does Peter help Andy remain stable and healthy through their lifelong familial bond and daily conversations, Peter maintains Andy's trust and ensures that their mother's house remains a

safe and hospitable place for Andy to reside in. Andy describes the way Peter cared for each of the parents in their final days and one can't help but imagine Peter playing the same role for Andy.

### G.    Mr. Eidelman Is Deeply Remorseful for His Actions

It is certainly true that nearly everyone who ends up in the criminal justice system experiences some level of remorse. The question for the Court must always be whether the remorse is for having committed the crime or for having been caught. In this case, Mr. Eidelman's life and biography demonstrates a man who has lived a life dedicated to being a positive member of society while building and supporting his family. As all of his children relate, he raised them to be ethical, law-abiding, and to never take what was not theirs. In this instant, he betrayed all of those ideals and outside of the case, has to live with the impact on all of that which he has cared for and loved.

Mr. Eidelman has addressed his remorse, his failures, and his desire for redemption at every step of the way, from the first meeting with agents, through the probation investigation, up through this moment. He is aware of the wrong he has done, but seeks to redeem himself through his deeds and actions moving forward:

> "Last, but not least, I need to take responsibility to society. I deeply regret degrading my profession by violating the rules of ethics that it rightly imposes. I broke the public trust and took what I was not entitled to in this case. I know I am deserving of punishment. I hope that in doing so, it can help the process of healing the harm I have caused. My actions harmed the company, the community, my family, and society, and for that I take full responsibility." (Ex. A: Peter Eidelman Letter.)

Mr. Eidelman's actions, as well as the harm that he has caused to those around him and the harm that he has brought on himself, may be considered in contrast with the way he has lived the other fifty-plus years of his life. His level of remorse, though, is deep and sincere and demonstrates a man who has come to terms with his failings and seeks to find hope again.

### V.    CONCLUSION

Mr. Eidelman has lived an upright life dedicated to hard work and supporting his

DEFENDANT PETER EIDELMAN'S SENTENCING MEMORANDUM
CR-19-00431-WHA

1  family. He has fallen hard and fast, but is equally determined to rise through rehabilitation and

2  redemption. His life history shows that this is not only possible, but certain. A sentence of

3  probation with conditions that he continue to receive therapy, complete substantial community

4  service, would be "sufficient, but not greater than necessary" to serve the goals of sentencing.

5  In the alternative, if the Court is inclined to sentence Mr. Eidelman to custody, we request that

6  custody be served through home confinement, so that he can continue to support his family,

7  take care of Andy, and continue to seek counseling.

8

9

Dated:    July 7, 2020

10

11                                                          /s/ John Hamasaki

12                                                          John Hamasaki
                                                            Attorney for Defendant Peter Eidelman
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT PETER EIDELMAN'S SENTENCING MEMORANDUM
CR-19-00431-WHA